UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Kitty Marie Freegard,

Plaintiff,

v.                                          Civil Action No. 1:11-CV-12

Michael J. Astrue,
Commissioner of Social Security,

Defendant.

## REPORT AND RECOMMENDATION
(Docs. 9, 12)

Plaintiff Kitty Marie Freegard brings this action pursuant to 42 U.S.C. § 405(g) of

the Social Security Act, requesting review and remand of the decision of the

Commissioner of Social Security ("Commissioner") denying her application for disability

insurance benefits.  Pending before the court are Freegard's motion to reverse the

Commissioner's decision (Doc. 9), and the Commissioner's motion to affirm (Doc. 12).

For the reasons stated below, I recommend granting Freegard's motion, in part, and

denying the Commissioner's motion.

## Background

Freegard was born on April 26, 1975, and thus was thirty-three years old on the

alleged disability onset date of January 26, 2009.  (Administrative Record ("AR") 24,

132, 136, 185, 191.)  She did not complete high school, departing at the end of her

sophomore year, and has not subsequently completed a high school diploma program.[1] (AR 24-25.)  Freegard has work experience as a deli cook, a floral clerk, a public works clerk, a cutter/packer, an assembly-line laborer, a cashier, a library aide, and a teachers' aide.  (AR 25, 43-44, 177-83.)  In December 2006, Freegard injured her back in a sledding accident.  (AR 283, 294, 299.)  Approximately one month later, she slipped on ice, causing further injury to her back.  (AR 293.)  Since then, Freegard alleges that she has suffered chronic back pain and numbness in her lower extremities, which has resulted in significant limitations in her lumbar mobility and trunk extension.  (AR 252, 276, 283, 294, 299, 300, 302, 324, 335.)  Freegard also alleges that she suffers from fibromyalgia, carpal tunnel syndrome, and mental health issues including a learning disorder.  (AR 10.)

On April 30, 2009, Freegard filed applications for supplemental security income and disability insurance benefits ("DIB").  (AR 56-57, 132-44, 185.)  The applications were denied initially and on reconsideration.  (AR 56-61, 72-85.)  Pursuant to her DIB application, Freegard alleges that, starting on January 26, 2009, she became unable to work as a result of her back pain, fibromyalgia, learning disability, and carpal tunnel syndrome.  (AR 191.)  She claims that her back pain prevents her from being able to "get through a full day," and that she is unable to twist, turn, or lift; and stand or sit for longer than two or three hours.  (*Id.*)  She further claims that pain prevents her from being able to concentrate or focus, and that her learning disability makes remembering instructions and lists of tasks difficult if not impossible.  (*Id.*)

---

[1] The Social Security Administration's Disability Report states (apparently inaccurately) that Freegard completed school through the twelfth grade.  (AR 190.)

On July 19, 2010, Administrative Law Judge ("ALJ") Thomas Merrill conducted a

hearing on Freegard's application.  (AR 21-55.)  Freegard appeared and testified, and was

represented by a non-attorney representative.  (*Id.*)  Freegard's husband, as well as

vocational expert ("VE") John Bach, were also present and testified at the hearing.  (AR

39-41, 42-54.)  On August 5, 2010, the ALJ issued a decision finding that Freegard was

not disabled under the Social Security Act from her alleged onset date of January 26,

2009 through the date of the decision.  (AR 7-15.)  On December 1, 2010, the Decision

Review Board notified Freegard that it had not completed its review of the claim during

the time allowed, making the ALJ's decision final.  (AR 1-3.)  Having exhausted her

administrative remedies, Freegard filed her Complaint in the instant action on January 12,

2011.  (*See* Doc. 3.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).

The claimant is presumptively disabled if the impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The fifth and final step requires the ALJ to determine whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity").

Employing this sequential analysis, ALJ Merrill first determined that Freegard had not engaged in substantial gainful activity since her alleged onset date of January 26, 2009.  (AR 10.)  At step two, the ALJ found that Freegard had the severe impairment of "chronic back pain of an unknown etiology," but that her alleged fibromyalgia, carpal tunnel syndrome, and mental health issues were not severe.  (*Id.*)  Next, the ALJ determined that Freegard did not have an impairment or combination of impairments that met or medically equaled any impairment contained in the Listing of Impairments in 20 C.F.R. part 404, subpart P, appendix 1 ("the Listings").  (*Id.*)

The ALJ then determined Freegard's RFC, finding that she was able to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that she was "limited to

standing and walking for 3 hours total in an 8 hour workday and sitting for up to 6 hours total in an 8 hour workday with the ability to alternate sitting and standing at will." (AR 10.) The ALJ noted that Freegard could "perform postural activities and has the unlimited ability to use her hands and feet for operation of controls." (*Id.*) At step four, the ALJ found that Freegard could not perform her past relevant work as a cutter/packer, short-order cook, cashier, stock clerk, city public worker/painter, machine brusher, and packager. (AR 13-14.) At step five, relying on testimony from the VE, the ALJ determined that Freegard was capable of performing the requirements of several representative occupations existing in significant numbers in the national economy, including cashier II, marker in the retail trade industry, gate guard, routing clerk, ticket seller, and cutter/paster of press clippings. (AR 14-15.) The ALJ concluded that Freegard had not been under a disability, as defined in the Social Security Act, from January 26, 2009, the alleged onset date, through the date of his decision. (AR 15.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

5

423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

**I.    Medical Opinion Evidence**

**A.    Treating Physician's Opinion**

Freegard contends that the ALJ failed to accord the proper weight to the opinion of treating physician Dr. Alicia Cunningham.  Dr. Cunningham is an internal medicine physician who treated Freegard from January 2009 through the date of the ALJ's decision.  (AR 322, 393.)  On March 19, 2009, Dr. Cunningham opined that Freegard could sit "for an extended period of time," but could not stand for more than a fifteen-to-thirty-minute stretch, could lift no more than ten pounds, and could do no repetitive twisting or bending.  (AR 322.)  On April 1, 2009, Dr. Cunningham emphasized that Freegard "<u>can</u> sit for an extended period of time" and again stated that Freegard could stand for no more than thirty minutes at a time.  (AR 321.)  Approximately six months later, on October 14, 2009, Dr. Cunningham made a more detailed report which included more severe limitations, opining that Freegard could sit for only four hours in an eight-hour workday "if able to get up once an hour"; could stand and walk for less than one hour in an eight-hour workday; could sit, stand, and walk in combination for only four hours in an eight-hour workday; could bend, stoop, twist, kneel, climb, push/pull, and drive for less than one hour in an eight-hour workday; and could lift and carry only less than ten pounds.  (AR 393.)  Approximately seven months later, on May 12, 2010, Dr. Cunningham amended her October 2009 opinion by stating that Freegard could lift and carry no weight; and leaving blank portions of the form requesting the amount of time Freegard was capable of sitting, standing, and walking, independently, in an eight-hour

workday, and reiterating that Freegard could sit, stand, and walk in combination for only four hours in an eight-hour workday.  (AR 395.)

The ALJ stated in his decision that he gave "great weight" to Dr. Cunningham's initial March 2009 opinion.  (AR 13.)  Conflictingly, however, the ALJ's RFC determination includes a finding that Freegard could stand and walk for three hours in an eight-hour workday (AR 10), despite Dr. Cunningham's March 2009 opinion that Freegard could stand for no longer than thirty minutes at a time (AR 322).  The ALJ further stated that he gave "little weight" to Dr. Cunningham's October 2009 and May 2010 opinions because they were "not consistent with the evidence of record," as "[n]either Dr. Cunningham's own treatment notes nor the record as a whole reflect[s] deterioration in [Freegard's] condition commensurate with this decreased work capacity." (AR 13.)

Under the "treating physician rule," a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 567-69 (2d Cir. 1993).  Applied here, Dr. Cunningham herself admitted that her opinions were not supported by clinical findings, as clinical tests were "all negative" (AR 396) and the only support for her opinions were "[Freegard's] exams [and] her report[s] of pain" (AR 394).  Given this lack of support from clinical or laboratory findings, Dr. Cunningham's opinions are not entitled to controlling weight.  But even when a treating physician's opinion is not given

controlling weight, the opinion is still entitled to *some* weight because a treating physician "[is] likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).

Under the Commissioner's regulations, the ALJ must consider the following factors when assigning weight to the opinion of a treating source: "(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) whether the treating physician presents relevant evidence to support an opinion, particularly medical signs and laboratory findings; (4) whether the treating physician's opinion is consistent with the record as a whole; (5) whether the treating physician is a specialist in the area relating to her opinion; and (6) other factors which tend to support or contradict the opinion."  *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); 20 C.F.R. § 404.1527(d)(2)-(6)).  After considering these factors, the ALJ must "give good reasons" for the weight afforded to the treating source's opinion.  *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (quotation marks and citation omitted).  "Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  *Id.* at 129-30 (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *see Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the

weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

In determining what weight to give Dr. Cunningham's October 2009 and May 2010 opinions, the ALJ appears to have considered only the fourth of the above six factors – whether the opinions were consistent with the record as a whole.  (*See* AR 13.) Had the ALJ considered the other factors, particularly the frequency of Dr. Cunningham's evaluation of Freegard in the approximately one-and-one-half year-period that the Doctor treated Freegard prior to the ALJ's decision, the ALJ may have given more weight to the opinions.  In particular, the ALJ should have noted that Dr. Cunningham examined Freegard at least fourteen times between February 2, 2009 and July 7, 2010.  (*See* AR 333, 335, 337, 338, 343, 345, 348, 349, 412, 418, 419, 430, 433, 435.)

More importantly, the record does not support the ALJ's determination that Dr. Cunningham's October 2009 and May 2010 opinions are unsupported and inconsistent with the other evidence.  Noteworthy, the "record" in this case largely consists of treatment notes from Dr. Cunningham herself.  These notes indicate that, in November 2009, although Freegard "actually look[ed] fairly comfortable sitting" during an office visit, she could not "sit or stand or walk" for more than "10 to 15 minutes."  (AR 425.) In February 2010, Dr. Cunningham noted that Freegard was "ha[ving] severe pain in her lower back and it [wa]s swollen," and that Freegard could not sit, although sitting was more comfortable than standing.  (AR 412.)  In April 2010, Dr. Cunningham reported

that Freegard had "[s]topped going on long car rides," was sitting straight "OK" for only "a few minutes" and then needed to move, and could walk for only ten minutes and then "need[ed] to sit." (AR 435.) Around the same time, Dr. Cunningham noted that Freegard's back pain was an "ongoing issue," and that she had "[r]ecently developed some pain in [her] upper back–spasm." (AR 433.)

The ALJ's other explanation for giving great weight to Dr. Cunningham's earliest opinion and little weight to the later ones – that the record does not reflect "deterioration in [Freegard's] condition commensurate with th[e] decreased work capacity" found in the later opinions (AR 13) – is also not supported by substantial evidence. Rather, the notes described above, coupled with Dr. Cunningham's October 2009 and May 2010 opinions themselves, which were made after the Doctor had significantly more office visits with Freegard than before the initial March 2009 opinion, support a slight deterioration in Freegard's condition since March 2009. Admittedly, however, there are other records which seem to indicate that Freegard's condition remained stable during that period. Given this ambiguous state of the record on the critical issue of the weight to be afforded to the most recent opinions of treating physician Dr. Cunningham, the ALJ had a duty to develop the record prior to rejecting those opinions. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

The Second Circuit has stated: "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel . . . ." *Id.* (quotation marks omitted). This principle is especially valid where, as here, there are only two medical professionals (Dr.

11

Cunningham and S. Green, discussed below) who provided medical opinions relevant to the claimant's condition during the relevant period, and only one of those professionals (Dr. Cunningham) actually treated the claimant.  In *Clark v. Commissioner of Social Security*, 143 F.3d 115 (2d Cir. 1998), which involved facts similar to those at issue here, the Second Circuit held:

> Clark has argued that the ALJ "should have acted affirmatively to seek out clarifying information" concerning the perceived inconsistencies between Dr. Sookhu's two reports.  If asked, Dr. Sookhu might have been able to provide a medical explanation for why Clark's condition deteriorated over time.  Likewise, the doctor might have been able to offer clinical findings in support of his conclusion that Clark could not sit for most of the workday.  Dr. Sookhu's failure to include this type of support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case.  There is, to say the least, a serious question as to whether the ALJ's duty to develop the administrative record was satisfied in this case.

*Id.* at 118.  Likewise, in this case, the ALJ should have attempted to contact Dr. Cunningham to inquire about the differences in her March 2009 and October 2009/May 2010 opinions, and specifically to explain in more detail her apparent opinion that Freegard's condition deteriorated between the time of her initial opinion and her later opinions.

The Commissioner argues that the ALJ's decision to give little weight to Dr. Cunningham's October 2009 and May 2010 opinions is supported by the record, and particularly by records reflecting that Freegard's Percocet prescription "never changed." (Doc. 12 at 7.)  I reject this argument for two principal reasons.  First, the ALJ did not discuss Freegard's use of Percocet to justify his treatment of Dr. Cunningham's opinions,

and thus this is clearly a *post-hoc* rationalization of the ALJ's decision being provided by
the Commissioner.  *See Snell v. Apfel*, 177 F.3d at 134 (holding that a reviewing court
"may not accept appellate counsel's *post hoc* rationalizations for agency action")
(quotation omitted).  Second and more importantly, this is an over-simplification of
Freegard's medication usage during the relevant period.  In fact, as discussed in
Freegard's Reply (*see* Doc. 13 at 12), the record reflects that Freegard did not even begin
taking Percocet for her back pain until June 2009, which was *after* Dr. Cunningham made
her initial March 2009 opinion.  (AR 374.)  This fact alone supports the Doctor's
apparent opinion that Freegard's condition deteriorated after her March 2009 opinion,
especially considering that Dr. Cunningham was leery of prescribing chronic narcotic
therapy to Freegard (AR 375).

   The record also reflects that between March and June 2009, Freegard tried
Zanaflex, gabapentin, tramadol, Neurontin, and Vicodin (AR 375, 377, 380, 382, 384);
and Dr. Cunningham considered prescribing Cymbalta on a number of occasions, but
Freegard could not afford it (AR 336, 375, 380).  In a July 2009 progress note, Dr.
Cunningham discussed the various treatment methods, including medications, attempted
by Freegard during the relevant period, and concluded that Percocet provided some relief
but did not leave her pain-free.  The Doctor stated:

> Continues to have low back pain . . . .  We have tried a wide variety of
> things including physical therapy, injections, tramadol, muscle relaxants,
> anti-inflammatories, and Effexor without any relief.  When I saw her last,
> we settled on Percocet, 60 per month.  . . . She finds that she is much better
> in terms of pain control with the Percocet . . . although continues to have
> chronic nagging discomfort.

(AR 352.)  Clearly, Freegard's prescription regimen changed multiple times under the treatment of Dr. Cunningham, and thus, the record does not support the ALJ's conclusion that Freegard's condition remained the same during that period.  Furthermore, the record demonstrates that, even after Dr. Cunningham prescribed Percocet, Freegard's back pain persisted.  (*See, e.g.,* AR 402, 406, 412.)  And in a February 2010 medical note, Dr. Cunningham specifically stated,  "[P]ercocet not helping."  (AR 412.)

### B.    State Agency Medical Consultant's Opinion

Freegard argues that the ALJ also erred in affording "great weight" to the July 2009 opinion of S. Green, a non-examining state agency medical consultant.  (*See* AR 360-67.)  The ALJ justified such decision by stating that "[Green's] opinion is consistent with . . . the medical record as a whole," and Green "supported his opinion with references to the medical record."  (AR 12.)  The ALJ acknowledged that Green had not reviewed all the relevant evidence before rendering his opinion, but stated that the opinion was nonetheless valid even "in light of th[e] new evidence."  (*Id.*)  Oddly, the ALJ's reference to "new evidence" does not appear to include the significant October 2009 and May 2010 opinions of Dr. Cunningham, but rather refers only to "further allegations" made by Freegard "after Mr. Green rendered his opinion."  (*Id.*)

The regulations provide that, in general, "more weight" is given to the opinion of a medical source who has examined the claimant than to the opinion of a source who has not.  20 CFR § 404.1527(d)(1); *see Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986) ("opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians").  Additionally,

while the findings of non-examining analysts can, and often do, provide valuable

supplemental support for an ALJ's decision, they should generally be afforded relatively

little weight in the overall disability determination.  *See Vargas v. Sullivan*, 898 F.2d 293,

295-96 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have

not personally examined the claimant deserve little weight in the overall evaluation of

disability.").  Here, as discussed in detail above, Dr. Cunningham had an extensive

treating relationship with Freegard, whereas Green merely reviewed the records in

existence at the time of his report and formulated an opinion based thereon.  The ALJ

should have at least acknowledged this difference and considered its effect on the

comparable weight of the medical opinions.

The matter should be remanded for a re-weighing of the medical evidence,

including the opinions of treating physician Dr. Cunningham and agency consultant S.

Green.  The ALJ's failure to properly consider this opinion evidence does not amount to

harmless error because the VE testified at the administrative hearing that if, as Dr.

Cunningham opined in her most recent May 2010 report (*see* AR 395), Freegard could

sit, stand, and walk in combination for only four hours in an eight-hour workday and

could not consistently lift or carry any weight, she "would not be able to perform her

prior work . . . [and] could not perform any full[-]time jobs."  (AR 48.)  On remand, the

ALJ should also reassess Freegard's RFC, in consideration of his new findings with

respect to the medical evidence.

## II.     Mental Health Impairments

Freegard contends that the ALJ failed to properly develop the record regarding her mental health impairments.  This argument lacks merit, as there is not enough evidence in the record to support a mental health impairment, and thus there was no need for the ALJ to order a consultative examination or otherwise develop the record on this issue.  In support of this argument, Freegard cites only to trifling and unsubstantiated evidence, including (a) her own testimony at the administrative hearing that she was "in special ed.," had "ADD" or a "learning disorder," and "had difficulty reading" while in school (AR 29); (b) a November 2008 medical note which records that Freegard experienced "mild psychological distress that appears to be directly related to her difficulty coping with her current functional limitations" (AR 301); and (c) an April 2009 medical note which states that a referral was being made to a "psychiatric staff member" at the pain clinic "for evaluation for anxiety/depression and coping mechanisms for chronic pain" (AR 324).  This limited evidence does not reflect a mental health impairment "which significantly limit[ed] [Freegard's] . . . mental ability to do basic work activities," as required by 20 C.F.R. § 404.1520(c); and the record taken as a whole reflects that Freegard did not have any ongoing disabling mental health problems.

In fact, as pointed out by the Commissioner, a February 2009 treatment note records that Freegard "denie[d] any history of depression or anxiety" (AR 326), and a May 2009 treatment note reflects that Freegard "fe[lt] that [she] actually manage[d] the pain well from an emotional perspective" (AR 333).  Moreover, Freegard stated in her Function Report that she was able to pay attention "all day"; she followed written

16

instructions "to a tee"; she had "no problems" getting along with authority figures; and she handled stress and changes in routine "fine."  (AR 161.)

## III.    Ability to Perform "Other Work"/Vocational Expert Testimony

Given the recommendation that this matter be remanded for a reassessment of the medical opinions and a re-determination of Freegard's RFC, the ALJ will also be required to reconsider his step-five finding that Freegard was able to perform "other work that exists in significant numbers in the national economy."  (AR 15.)  As discussed below, there are particular areas which warrant further development or analysis.

### A.    Freegard's Education

On remand, the ALJ should specifically take into account Freegard's apparent failure to obtain a high school education, and include this limitation in any hypothetical posed to the VE.  As stated previously, the law requires that, if the ALJ finds that the claimant cannot perform her past work, at step five, the Commissioner considers whether she can perform any other work available in the national economy based on her RFC, age, *education*, and prior vocational experience.  *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  In his decision, the ALJ appears to have made a clearly erroneous finding that Freegard "has at least a high school education."  (AR 14.)  Although the Social Security Administration's Disability Report form indicates that Freegard completed school through the "12th grade" (AR 199), Freegard testified at the administrative hearing that she left high school after the tenth grade and has not since completed high school since then (AR 24-25).

17

At a minimum, on remand, the ALJ should further develop the record on this issue, determining whether Freegard in fact completed high school.  Contrary to the Commissioner's argument, Freegard's education is not irrelevant to the propriety of the ALJ's decision, as the VE testified that, at least with respect to some of the positions which he identified as jobs Freegard was able to perform, a high school degree is "prefer[red]," and the absence of such a degree "would decrease [the claimant's] employability [or] ability to get those jobs."  (AR 49.)  Even absent this testimony, logic directs that Freegard's apparent lack of a high school education, coupled with the ALJ's RFC finding that Freegard must be able to "alternate sitting and standing at will," significantly erodes her occupational base.  *See* SSR 83-12, 1983 WL 31253, at *4 (1983) ("Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will.").

### B.       Jobs Existing in "Significant Numbers"

Freegard argues that the VE failed to identify jobs that exist regionally in "significant numbers," as required by 20 CFR § 416.960(c).  *See Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).  Specifically, Freegard asserts that twenty-five, 150, and 200 jobs, respectively, do not constitute "significant numbers," particularly in a rural region like Vermont.  (Doc. 9 at 18.)  However, the VE testified to a total of 695,000 national jobs and 5,475 regional jobs that Freegard could perform.  (*See* AR 15, 46-47.)  Courts have generally held that what constitutes a "significant" number of jobs is fairly minimal.  *Fox v. Comm'r of Soc. Sec.*, No. 6:02-CV1160 (FJS/RFT), 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009) (citing cases, and holding that 132,980 national jobs and

200 regional jobs constituted a "significant number of jobs," even if diminished by a small percentage in the VE's estimation); *see Bull v. Comm'r of Soc. Sec.*, No. 1:05-CV-1232 (LEK/RFT), 2009 WL 799966, at *6 (N.D.N.Y. Mar. 25, 2009) ("vocational expert's testimony stating that there were approximately 100,000 jobs . . . in the national economy and 125 locally constitutes a significant number"); *Henry v. Astrue*, No. 07 Civ. 0957 (WCC), 2008 WL 5330523, at *10 (S.D.N.Y. Dec. 17, 2008) (finding 1,208 jobs in regional economy to constitute a sufficient number); *but see Robinson v. Astrue,* No. 08-CV-4747 (RJD), 2009 WL 4722256, at *2 (E.D.N.Y. Dec. 9, 2009) ("while the Social Security Act does not specify any precise formula for determining whether a particular number of jobs is sufficiently 'significant,' a number of courts have suggested that [200 local jobs and 3,000 national jobs] would not qualify as sufficiently significant") (citing cases).  Based on a review of the case law in this Circuit, it is reasonable to assume that 695,000 national jobs and 5,475 regional jobs constitute "significant" numbers of jobs. Therefore, the ALJ's reliance on the VE's testimony on this issue is not a grounds for remand.

> C.    **"50% Reduction" Methodology**

Finally, Freegard claims that the methodology used by the VE to determine how many jobs exist that she can perform is not sufficiently reliable, and more specifically, that the ALJ's acceptance of the VE's apparent reduction of jobs by "50% due to the limitations identified in the [assessed RFC]" (hereafter referred to as the "50% reduction" methodology) is "wholly irrational."  (Doc. 19 at 20 (citing AR 14).)  (*See also* AR 46, where VE testified to his reduction of jobs by "approximately half.")  At the

administrative hearing, the VE testified that the job numbers he cited were based on:

>   labor market information data that's published by SkillTRAN Incorporated, and those numbers . . . are published by the United States Bureau of Labor Statistics and various publications.
>
>   . . . .
>
>   . . . [I]t's a methodology that involves a couple of different steps, but the numbers that I gave you are the estimates of the numbers of people employed by the DOT occupational classification system.
>
>   . . . .
>
>   . . . [T]he SkillTRAN people have come up with a methodology to take the end analysis an extra step by looking at the industries that employ the workers in the DOT occupations within the SOC code, coming up with a, a density factor for each of those DOT occupations and then ultimately coming up with an estimate for the . . . incidence of employment within the DOT occupation.
>
>   . . . .
>
>   . . . [I]t's a more sophisticated analysis that considers . . . what industries people are actually employed in.
>
>   . . . .
>
>   . . . [I]t's an extrapolation; it's an estimation using a fairly sophisticated and reliable methodology.
>
>   . . . .
>
>   It's a relatively new development or new methodology that just c[a]me out within the last few years.  It's growing in its use because its sophistication versus . . . some of the other methodologies that people would employ, but it['`]s been presented at conferences and it's growing in its acceptance by vocational experts.

(AR 52-54.)  In this explanation, the VE appears to have been referring to his formulation

of the *total* job numbers ("the full numbers of full time jobs") (AR 46), and not to the

"50% reduction" methodology.  In contrast, as argued by Freegard, the VE's "50%

reduction" methodology appears to have been "more of an off-the-cuff assessment."

(Doc. 9 at 19.)

Although the federal rules of evidence do not apply to vocational expert testimony

presented at disability adjudications, such testimony must, at a minimum, be "based on

identifiable statistics" and "informed by [the expert's own] expertise and experience," so

as to satisfy the "substantial evidence" standard applicable in disability proceedings.

*Palmer v. Astrue*, No. 1:10-cv-151-jgm, 2011 WL 3881024, at *6 (D. Vt. Sept. 2, 2011)

(citing *Piekarski v. Astrue*, No. 08-cv-372S, 2009 WL 2992277, at *5 (W.D.N.Y. Sept.

15, 2009) (recognizing Second Circuit has not addressed required foundation for

vocational expert testimony, but accepting vocational expert testimony based on

verifiable sources and expert's own adjustments based on his experience)).  Moreover,

"the ALJ needs some evidentiary basis to rely upon the opinions of the vocational

expert," and it is not enough for the expert to defend his opinions based on "his own

'digging.'"  *Ali v. Astrue*, No. 09-cv-166, 2010 WL 502779, at *5 (W.D.N.Y. Feb. 9,

2010).  "The fact that an expert is an expert alone should not justify unthinking reliance

upon his opinion."  *Id.*

Applied here, although the VE identified a proper evidentiary basis (quoted above)

for arriving at his *total* numbers, his seemingly impromptu statement that he "would

reduce th[ose] numbers . . . by approximately half" (AR 46) remains unexplained and

unsupported.  Moreover, as pointed out by Freegard, the VE discussed the "50%

reduction" methodology only in the context of the cashier job (AR 46) and not with

21

respect to the other five jobs which he opined Freegard could perform (AR 47-52). In fact, it would make little sense for the VE to have used an identical statistical reduction (50%) for each of six different jobs; at a minimum, some explanation from the VE would be required. On remand, if the ALJ again procures testimony from the VE which uses the "50% reduction" methodology, the ALJ should solicit from the VE an explanation regarding the foundation and reliability thereof.

## Conclusion

For these reasons, I recommend that the Commissioner's motion (Doc. 12) be DENIED, and Freegard's motion (Doc. 9) be GRANTED, in part, such that the matter be remanded for reassessment of the evidence and further development of the record, as discussed above. Freegard's request that the matter be remanded for a calculation of benefits should be DENIED, given that it cannot be said that a remand for further evidentiary proceedings would serve no purpose. *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

Dated at Burlington, in the District of Vermont, this 20th day of September, 2011.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).